UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X   Case No.:1:18-CV-07543 LGS
ANAS OSAMA IBRAHIM ABDIN

                                        Plaintiff,

                        -against-

CBS BROADCASTING, INC and/or CBS CORP.
AND/OR CBS All ACCESS, and/or CBS INTERACTIVE         THIRD AMENDED
Netflix, INC.                                        COMPLAINT
                                                     JURY TRIAL DEMANDED
                        Defendants.
------------------------------------------------------------------X

Plaintiff, ANAS OSAMA IBRAHIM ABDIN, through his attorneys, JOHN JOHNSON Esq. and
ALLAN CHAN, Esq. complaining of the defendants, CBS Broadcasting, Inc. et al. upon
information and belief sets forth and alleges as follows:

## NATURE OF CLAIMS

1.  Plaintiff commences the instant action seeking damages and a permanent injunction due
    to defendants' infringement of plaintiffs duly copyrighted work which is composed of
    text, artwork and video hereinafter ("the Original Work"). Plaintiff's final compellation
    of work was published in 2017. Plaintiff's Original Work actually became available to
    the public via world wide web, in 2014. Plaintiff holds a 2017 copyright in said work's
    Registration Number TX0008559280 as well as, any subsequent filings, if any. (Exhibit
    "A"). Plaintiff filed a prior 2015 copyright, which is not the subject of this action.
    Plaintiff seeks damages arising from the defendant's infringement of plaintiff's
    copyrighted works, as well as, other damages as delineated here in. The defendants are all
    active participants in the misappropriation of the plaintiff's work by including without

limitation, writing, production, broadcasting and/or live streaming of Plaintiff's copyrighted work and continuing such infringement by creating a derivative work substantially similar to plaintiff's copyrighted work. The defendants incorporated plaintiff's copyrighted material in their work entitled "STAR TREK DISCOVERY" which was first broadcast by the defendants on September 24, 2017 (the "infringing work"). The infringement continued in subsequent broadcasts with the continued used of plaintiff's characters, and when defendants used and or incorporated plaintiff's work by morphing the special powers of the tardigrade in a human who continues to use the tardigrades' special powers in subsequent episodes.   Additionally, the defendants included other attributes of the Original Work which as described herein which became and remain focal elements of the on-going series.  In fact, the special abilities attributed to plaintiff's Original Work, along with plaintiff's characters became the main difference between Star Trek Discovery and any other Star Trek show.

## JURISDICTION AND VENUE

2. This court has jurisdiction over this action pursuant to 28 U.S.C. §101 et seq. (the "Act") and pursuant to the principals of Supplemental Jurisdiction and/or Extra-Territorial Jurisdiction of this Court as delineated herein.

3. Additionally, this Court has jurisdiction pursuant to §1332 in that plaintiff is a citizen of Egypt and the defendants are U.S. corporations operating from headquarters in New York City, and the case and controversy exceeds $75,000.

4. Venue is proper in this district pursuant to 28 U.S. C.  §1391 et seq., 1400(a) in that the defendants operate corporate headquarters, sign contracts and make corporate decisions regarding the infringing property within the jurisdiction of the Southern District of New

York, resulting in continuous and systematic activity in New York State. Said headquarters are principal places of business for the defendants.

## THE PARTIES

5. Plaintiff, Anas Osama Ibrahim Abdin (hereinafter "Abdin") is a citizen of the Republic of Egypt ad a resident of the state of Kuwait having an address of P.O. Box 5969 Safat 13060, Kuwait.

6. Defendant CBS Broadcasting, Inc., and/or CBS Corporation (hereinafter "CBS") is a New York corporation with a principal place of business at 51 West 52nd Street, New York, N.Y. and is the executive producer/producer of the infringing work, and responsible for the broadcast and/or streaming of the infringing work. At all relevant times CBS transacted and conducted business within the State of New York.

7. Defendant CBS Corp. a/k/a CBS Corporation is a New York corporation with its principal place of business at 51 West 52nd Street, New York, N.Y. it is the Parent Company which exercises dominion and control over all CBS programming and any deals to license any such programming, including without limitation its wholly owned subsidiaries such as, CBS INTERACTIVE, INC.

8. Defendant Netflix, Inc., (hereinafter "Netflix")Purportedly licensed the infringing work and entered into a contract in the United States with the CBS defendants to stream the infringing work online internationally, while defendants CBS maintained all rights to stream or broadcast in the U.S. Netflix operates corporate offices within the State of New York at 245 West 17th Street New York, N.Y. and continues to make  the infringing work available internationally. By their acting in concert Netflix engages in systematic and continuous acts which bear a substantial relationship to the copyright infringement. The

international streaming of the infringing work(s) is derived from the licensing agreement entered into in the United states and purported second-generation copies of the work and derived from a U.S. mater copy. It is through the CBS defendants, and the interlocking agreements between the parties that allow Netflix to market and distribute the infringing work worldwide.

## FACTUAL BACKGROUND

9. Between May of 2014 and July of 2017. Plaintiff completed and published several forum articles, artwork, and audio/video characters and creatures which formulated the basis of his science fiction script for an upcoming video game/storyboard. While some of the content in these articles was factual such a tardigrade in space, as a whole plaintiff's work is creative and clearly meets the standard for copyright protection, <u>Atari Games v. Oman</u> 979 F. 2d 272.  Plaintiff published and/or posted on-line these articles in Adventure Game Studio Forums, Anas-tronaut Blog, You Tube, Steam Games, and Reddit between on or about 2014 and September of 2017 prior to the premiere of Star Trek Discovery (the "Original Work").   Star Trek Discovery did not premiere until September 24, 2017.

10. All of plaintiff's protected material can be found at <u>https:// anas-tronaut.blogspot.com</u>.  In addition, a simple search of tardigrades game will provide the researcher with links to the Original Work.  The Original Work was not simply placed on a website, the internet gaming community embraced the Work therefore it is ubiquitous. Exhibit G.

11.  The plaintiff has attached a list of all protected martial (Exhibit H) CD exhibit provided to court and opposing counsel. Additionally, plaintiff provides the court with a comparison of similarities between plaintiff's work and the defendant television program. (Exhibit  I  ) CD exhibit provided to court and opposing counsel.  The defendants use of plaintiff material which is essential to the Star Trek Discovery's entire season, along with

the derivative works created therein, can be found at Exhibit "J", CD exhibit provided to court and opposing counsel.

12. Plaintiff's material was posted prior to the premiere of Star Trek Discovery on Adventure Game Studio Forum (hereinafter "AGS") which is a popular widely disseminated online gaming forum with an estimated one million guests and users. Plaintiff's Original Works and the copyrighted work were available for viewing, playing and/or exposed to the AGS participants twenty-four hours a day, seven days a week, including their family and friends.   Upon information and belief, plaintiff's storyboard, including videos was distributed, and watched by fans on YOUTUBE approximately 3.2 million views, AGS approximately 200,000 exposing the game, storyboard and artwork to millions of science fiction fans. REDDIT numbers are currently undisclosed.   The approximate number of blog views 100,000, Twitter, 6,800 and Steam 13 million views. Upon information and belief, the defendants accessed the plaintiff's widely distributed works.   Plaintiff actively promoted his protected works on multiple websites and social media including commentaries: adventure game forum (2481 posts), Twitter (5000 tweets), Youtube (22 videos), blog (201 posts), and Reddit (800 post)..

13. More fortuitously, plaintiff and defendants are members of the Steam community. "Steam is a digital marketplace and video game platform used by tens of millions of PC gamers on a daily basis. The most popular games on Steam have more than 500,000 players online at any given time… Steam [is] the largest digital marketplace for PC games."   https://www.msn.com/en-us/entertainment/gaming/these-were-the-12-highest-grossing-games-of-2018-on-steam-the-biggest-platform-in-pc-gaming/ss-BBRFCIb.

Another website reporting directly from Steam itself, Geekwire reports 8.4 million

concurrent users per day, https://www.geekwire.com/2017/valve-reveals-steams-monthly-active-user-count-game-sales-region/

14. Steam was reported to have earned "revenue of $1,345,301.29, but, as is standard, Valve takes a **30 percent** cut of Steam sales, leaving publishers and developers with 70 percent…in this case $941k." https:// www.engadget.com/2015/03/13valve-steam/. In 2015 there were approximately 14 million Steam members poled regarding plaintiff's game.

15. Notwithstanding the fact that Steam Greenlight had its own internal problems, "Steam Greenlight was launched in 2012 as a way for indie developers to get their games on Steam, even if they weren't working with a big publisher that had a relationship with Valve. Steam users would vote on Greenlight games, and Valve would accept titles with enough support to suggest that they'd sell well. Kroll says that "over 100" Greenlight titles have made $1 million or more…Steam Greenlight was launched in 2012 as a way for indie developers to get their games on Steam, even if they weren't working with a big publisher that had a relationship with Valve. Steam users would vote on Greenlight games, and Valve would accept titles with enough support to suggest that they'd sell well."https://www.theverge.com/2017/2/10/14578780/valve-steam-greenlight-shut-down-direct-submissions.  "The merits of each game would be pitched to the audience and those garnering the most votes would go on sale." https://www.wired.co.uk/article/valve-drops-steam-greenlight-for-steam-direct.

16. "Now, five years since Greenlight started, we've seen over 90 Million votes cast on submissions in Greenlight. Nearly 10 Million players have participated in voting in Steam Greenlight, but over 63 million gamers have played a game that came to Steam via

Greenlight. These players have logged a combined 3.5 Billion hours of game time in Greenlight titles." gamers have played a game that came to Steam via Greenlight. These players have logged a combined 3.5 Billion hours of game time in Greenlight titles."

https://steamcommunity.com/games/593110/announcements/detail/12659223215141825

95.  If one does the math, this is approximately one vote per user.

17. Plaintiff submitted his game to Steam on or about November 21, 2014. At the time of plaintiff's submission, plaintiff's Original Works were required to undergo a process called "greenlight".  The greenlight process is similar to that which takes place in the television and movie industry.  Instead of a television or movie executive giving the "ok" for the project to be aired, Steam required all members of Steam to access, view and approve the Original Work before it would be placed on the Steam website for millions of fans.  Notwithstanding the fact that Steam has moved away from the greenlight process to allow more games to reach the public,[1] plaintiff's work had to endure the more arduous process of being greenlit first, before becoming a member of the Steam community. "In Greenlight, developers can put up their game concepts (including screenshots, preview videos, and early builds) upon which community users can vote for these titles. Once titles have received a required number of votes, **Valve** will determine if the title is appropriate for the service, and then start working with the developer to bring the game/software to the Steam digital marketplace. Once this stage is reached, the game is considered 'Greenlit'." [2] So how does the greenlight process actually work?

---

[1] https://steamcommunity.com/games/593110/announcements/detail/558846854614253751
[2] https://en.wikipedia.org/wiki/Category:Steam_Greenlight_games

18. Citing,https://gamedevelopment.tutsplus.com/articles/tips-for-getting-greenlit-on-steam-greenlight--gamedev-13938, we find "that  in order to be Greenlit, your game will have to rank in the top X of those currently being voted upon… Thus, in order to safely ensure comfortable passage onto Steam, you should probably aim for a ranking in the top 100, if not the top 50. Thus, X equals somewhere between 50 and 100." The article further states that at any given time 1,500 games are submitted.  Therefore, over any annual period hundreds of thousand of games are submitted.  Plaintiff's game being ranked worthy of being included in the community is no small feat. "Generic RPG Maker games, games better suited for mobile devices, and games with inferior graphics litter Greenlight, and are almost immediately dismissed by Valve's fickle community." Again, plaintiff's accomplishment was no small feat.

19.  The article further cites the owners of a game called "Drifter".  The owners of that game commented on the required number of votes needed for a game to be greenlighted on Steam. "The [Drifter] studio points out that, by their measures, approximately 16,000-17,000 votes are needed to crack the top 100, and 50,000 are needed to reach the top ten." The article was published in 2014 when Steam did not have as many members. However, the article points out that approximately 28,000 votes are required to be greenlighted by Steam at that time.  Over time Steam has acquired substantially more members and a much larger community based on the MSN article cited earlier.[3]

20.  Plaintiff's work was "greenlit" on August 26, 2015.

---

[3] Plaintiff's work has been widely disseminated see exhibit G  thereby giving defendants further access to the Original Work, see ABKCO Music, Inc. v. Harrisongs Music, LTD., 722 F. 2d 988.  Access is defined as having the opportunity to copy, Favia v. Lyons Partnership No. 94, Civ 3277, 1996 WL 194396, see also, Moyna LLC v. Victoria's Secret Direct New York LLC, 2003 WL 21983032.  Plaintiff's Original Work has been  viewed  on Twitter 6800, the Anas blog 100,000 times, the Adventure Games Forum website  200,000 times, and youtube 3.2 million views. Clearly, not only did the defendants have direct access, access can be inferred from the wide dissemination.

21. As stated, defendants have been a member of the Steam community since approximately 2010, when the first Star Wars games were placed on Steam.  As members of the Steam community the defendants had direct access to plaintiff's game/storyboard, based upon the fact that that Original Work was posted for the entire Steam Community, inclusive of the defendants, and voted on by said community.  Hypothetically, if the defendants or their agents did not vote yea or nay for the plaintiff's game, they certainly had direct access to it.

22. Additionally, it is a known fact that defendant CBS' Star Trek Discovery series writers and production team are a part of the Steam Community.  These individuals had full and direct access to the plaintiff's Original Work, prior to the start of the Star Trek Discovery series. Upon information and belief one of the Star Trek Discovery head writers, Erika Lippoldt is a Steam member, and was poled in the greenlight process. This "link" as outlined in. Clonus Assocs. v. Dreamworks, LLC, 457 F. Supp. 2d 432, shows a direct connection, and combined with the wide dissemination of plaintiff's work clearly establish access.

23. Plaintiff is the sole and lawful proprietor of all rights, title and interest in and to the copyrighted Original Work.

24. The substantial, salient and original aspects of the Original Work, copyrighted under the Act and the laws of the United States are as follows: The Original Work centers around a novel science fiction story centered on space travel facilitated by a fictitious larva-like creature with eight appendages, a multitude of teeth, sized larger than a human being, depicted with a blue hue, labeled the "Tardigrade". The Original Work features a tardigrade with super powers, these powers focused around space travel especially at

exhilarating or instantaneous speeds. An essential element of the game/storyboard artwork, script and video include the tardigrade featured floating in space, then moving through space at great distances instantaneously. The concept of instantaneous space travel based upon the DNA or natural abilities of the fictious creature are original to the plaintiff's Original Work.  The Original Work was in fact eventually named Tardigrades. See generally, steamcommunity.com, anas-tronaut.blog.com and the AGS Forums.

25. A list of all of plaintiff's posts of the Original Work are stated herein at Exhibit "K". CD provided to the Court and Counsel.

26. Plaintiff's tardigrade and its abilities from the tardigrade game, artwork, storyboard compared with the Tardigrade character from the defendants' series are strikingly and/or substantially similar. Additionally, prior to plaintiff's Original Work being exposed to millions online, no other Star Trek series featured a single tardigrade being used for space travel or to power a space ship based on the placement of the tardigrade DNA into a human being.  These scenarios are unique to the plaintiff's original work.

27. In further infringement, subsequent episodes of Star Trek Discovery, the defendants began using the tardigrades' DNA which was injected into a crew member as the means to navigate their spaceship. This change thereby creates a derivative work since it was based upon plaintiff's Original Work. Additionally, the "chamber" in which this injection of the tardigrade DNA takes place, is also strikingly and/or substantially similar to the plaintiff Original Work. (see exhibit "B" for examples of the similarities.) This type of fictional space travel based on tardigrade instantaneous travel is utilized as integral to the plot of each and every episode of the infringing work. This fact is borne out in an article in "ScreenRant" magazine in which the author states that "[the] "introduction of a new

alien species is rather unlike anything seen before in Star Trek". See also, Exhibit ("C"). Articles from Popular Mechanics, and TV Line. Touting the importance of the Tardigrade to the Discovery series. (Exhibit "D").

28. The Original Work features a main character being absorbed into the tardigrade, becoming one with the tardigrade, and having the tardigrade's abnormal powers. This was directly copied by the defendants, as they had direct access to plaintiff's work prior to development of the Star Trek Discovery Series.

29. Plaintiff's Original Work also revolves around a gay relationship between two homosexual main characters, one is depicted in the game storyboard and artwork as an albino male with a dark complexion male with side burns, mustache, and beard. Concomitantly, the defendant's series include the exact same characters with striking/substantial similarity. Advocate magazine which is widely disseminated within the LGBTQ community states that the defendants made history by introducing an openly gay couple into the Star Trek universe. (Exhibit "E"). This concept is a major part of the defendant's series and is also a major part of the Original Work.  Entertainment Weekly also touts the brilliance of the defendant's infringement by the first introduction of a gay couple in its 51-year history.  Indiewire states that "Star Trek did not bury its gays". Again, this storyline was first introduced in plaintiff's Original Work.

30. The Original Work features uniforms which delineate status rank, etc., again defendant's infringement includes uniforms which are strikingly/substantially similar to the Original Work. Heretofore, the Star Trek series has not used any uniform styled, or colored in this manner, until plaintiff's Original Work was published. In fact, the Infringing Work's

uniforms are a total departure from prior Star Trek uniforms and represents copying of the Original Work. Other substantially similar characteristics include:

a. The Original Work also concentrates on main character Blonde White Male with similar characteristics as the infringing work, who is a space botanist, a person who specializes in plants. The Defendant focuses on a main character who is a science officer with an expertise in astromycology. This fictitious word is defined by the defendant as the study of "space mushrooms" or in lay terms plants, which is substantially similar to the Original Work.

b. The Original Work features fictional character named Aziz, a darker complexion homosexual male with black hair and a short-boxed beard, facial hair consisting of trimmed sideburns, mustache, and a goatee.  The defendants work features a dark complexion male homosexual with black hair a short-boxed beard, facial hair consisting of trimmed sideburns, mustache, and a goatee.

c. The Original Work features fictional character named Carter, who is a blond white male, who is a space botanist.  Again, the defendant's work features a blond white male who is an astromycologist (not a real-world word for botanist) .

d. The Original Work features fictional character named Yolanda, a female of African descent with messy curly hair.  Defendant's series features a female of African descent character named Michael Burnham with messy curly hair.

e. The Original Work features fictional character named Natasha, a white female with orange curly hair.  Defendant's work features a White Female with orange curly hair.

f.  The Original Work features Egyptian cultural influence and elements specifically throughout the series. The Original Work features an Egyptian spaceship that emits signals in the form of light beams called "The Emitter". Defendant's first episode includes a spaceship called the Sarcophagus surrounded with Egyptian like coffins which emitted light signals. The defendant's Michal Burnham character during one scene called the light beam from the Sarcophagus a "signal emitter."

g.  The Original Work features a scene of a giant blue tardigrade traveling through space at instantaneous speeds unaided by any external technologies. Defendant's Star Trek series features scenes of a giant blue traveling through space at instantaneous speeds unaided by any external technology.

h.  The Original Work features a scene with imagery of Carter, a blond White Male space botanist surrounded by a glowing blue light with scattered white light particles being enveloped by the tardigrade. The only human character in defendant's work, Paul Stamets, a blond white male astromycologist (botanist) navigated space within a chamber surrounded by glowing blue light with scattered white light particles as he absorbed the tardigrade DNA for later instantaneous space travel.

i.  The Original Work features a scene with imagery of a character traveling within an astro-plain environment, appearing as space with stars, having echoes of said person trailing himself. The defendant's work features a substantially similar scene wherein there is a background of a space like astro-plain, with a main character Michael Burnham seemingly traveling with trails of herself behind her.

j.  In the comparison video one can see that the defendants also copied the manner in which a character arrived in the astroplain, via a device with multiple circular disks glowing disks.  Plaintiff's comparison video demonstrates this at 3 minutes 17 seconds on the comparison disk, plaintiff has only one circular glowing disk

k.  Additionally, plaintiff's spacesuit is designed with an exaggerated egg-shaped helmet.  The shape of the helmet is considerably larger than the human head. The helmet has a square or rectangular instrument on the top.  Defendant also has an egg-shaped helmet with the rectangular instrument on top in the exact same position.

31. Again, the Original Work features physical details, abilities, and functionality of tardigrades that have not been published or utilized by anyone else until the copying by the infringing work. The appearance, color, size and abilities are essential elements lifted from the Original Work which are now essential elements of the Infringing Work. (Exhibit "C/D"). The characters of the Original Work are strikingly/substantially similar to the infringing work in both physical details, functionality and job description.

32. There are fictional characters, aesthetics and re-worked narratives that are unique to the Original Work that appear in the Infringing Work. The infringing work captures the total concept and feel, as well as, the artwork, and characters. These characteristics have never been used in the Star Trek series or films, and the basis for their inclusion now, is due to the infringement of the defendants. The defendants work can be considered strikingly similar If all the elements copied are viewed as a whole. In general, "[t]here is an inverse

relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required." Jorgensen v. Epic/Sony Records, 351 F.3d 46 (2d Cir. 2003).  In the instant action similarity is striking.

33.  "Plaintiff need not prove access if the similarity between the works is strong enough, then the trier of fact does not need to make a separate finding for access, as access will be inferred." Repp v. Webber, 132 F.3d 882, 889.  "In some cases, the similarities between the plaintiffs and defendant's work are so extensive and striking as, without more, both to justify an inference of copying and to prove improper appropriation." Arnstein v. Porter, 154 F.2d 464.

34. The protected likenesses, 4 out of 8 main characters in Star Trek: Discovery were copied from the defendant.  These characters were integral in every episode dominating most of the screen time.  Almost every episode of Star Trek Discovery after episode 3 relied on the spore drive as a plot device.  The spore drive could not function without the tardigrade's ability to travel quickly through space.  Star Trek: Discovery created a derivative work by injecting a crew member with tardigrade DNA giving him all its abilities, thus a proxy for the creature.  Major plot points like mirror universe and the end of the klingnon war was resolved with the aid of the spore drive.  Additionally, specific scenes which were copied are too detailed in similarity to be mere coincidence. Plaintiff's exhibit's clearly show these similarities. In fact, Defendant's argument that their tardigrade is not blue is easily dismissed by a simple google search (star trek discovery tardigrade) which clearly shows depictions of a blue creature.  On the issue of substantial similarity "The ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." Peter

Pan Fabrics v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960) Plaintiff has submitted substantial proof that the ordinary observer is confused as to origin, based on the press, the public; in the news articles, video discussions, and web postings, see attached exhibits., see also, google search as outlined above.

35. Plaintiff's Original Work was made available to the public since 2014 via various gaming portals, and websites as previously asserted, and including without limitation, discussion of this fact can be had at http://anas-tronautr.blogspot.com.

36. News of the defendant's infringement was highly publicized on the internet. One such article highlighting the plagiarism of plaintiff's game, at "Rock Paper Shotgun" was published very close to the time of the defendant's release of Star Trek Discovery. Rock Paper Shotgun has approximately 14,000,000 visits to their site. Purportedly said article prompted the Vice President of Legal Affairs to contact plaintiff. (Exhibit "F").

37. Plaintiff's counsel discussed the matter with the CBS attorney. This discussion was not for any settlement purpose. The call was wholly designed to discourage the plaintiff from taking legal action for infringement. Plaintiff was told that his Original Work was safe, CBS would not sue him for infringement! Such an unethical and subtle threat demonstrates the level to which the defendants were willing to descend. The treat not to sue plaintiff was made notwithstanding, the fact that plaintiff's game, artwork video and storyboard had been widely disseminated prior to the conception and/or airing of the infringing work. The conversation ended with an assurance of a second call which never transpired.

38. Plaintiff created the Original Works by working from a storyboard which he created. Plaintiff created all the artwork and/or designs, videos, concepts and storylines prior to

Star Trek Discovery and posted this Original Work on the internet. As outlined herein defendants infringed plaintiff's Original Work, violating his copyright in said works.

39. Plaintiff asserts that in this matter extra-territorial jurisdiction is warranted based on the holding in Update Art Inc. v. Modiin Publishing Ltd. 843 F. 2d 67 (1988). The Second Circuit Court of Appeals held that "It is well established that copyright laws generally do not have extraterritorial application. There is an exception [Emphasis Added] — when the type of infringement permits further reproduction abroad — such as the unauthorized manufacture of copyrighted material in the United States.[citing] Peter Starr Prod. Co. v. Twin Continental Films, Inc.,783 F.2d 1440, 1443 (9 Cir.1986); Robert Stigwood Group Ltd. v. O'Reilly, 530 F.2d 1096, 1100-01 (2 Cir.), cert. denied, 429 U.S. 848 (1976)." Plaintiff's assertion of extra-territorial jurisdiction is based on the predicate act of the CBS defendants signing a contract with defendant Netfllix in the United States to further the manufacture, and distribution of infringing material outside the United States.


## AS FOR A FIRST CAUSE OF ACTION
## (PERMANENT INJUNCTION)

40.  Plaintiff restates and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

41. Plaintiff is the sole and lawful proprietor of all rights, title and interest in and to the copyrights to the Original Work.

42. Defendants had both direct access on Steam, and access via wide dissemination of the Original Work by virtue of the Original Work being published with millions of views on the internet.

43. Defendants, without Plaintiff's authorization, knowledge or consent, willfully infringed Plaintiff's Original Work by causing to be written, produced, and broadcasted on live television and streamed via an on-demand streaming service, a strikingly and/or substantially similar copy of plaintiff's Original Work, including without limitation, reproduction on DVD's, and/or live streaming a derivative work entitled "Star Trek Discovery" – the Infringing Work—which is strikingly and/or substantially similar to Plaintiff's Original Work.

44. Accordingly, Defendants have infringed Plaintiff's copyright in the Original Work in direct violation and contravention of 17 U.S.C. §101 *et seq.* and 106 *et seq.* Plaintiff seeks impoundment of all copies of the Star Trek Discovery series and the immediate halt to its continued airing and/or sales and seeks to bar defendants' right to license said series.

45. Plaintiff will incur substantial and irreparable injury if Defendants are allowed to continue their infringement of the Original Work pending the resolution of this action. Plaintiff has sustained and continues to sustain substantial, immediate and irreparable injury for which there is no adequate remedy at law, unless defendants are enjoined/ restrained. Defendants continue to infringe plaintiff's Original Work.

46. By reason of the forgoing, Plaintiff is entitled to a permanent injunction pursuant to 17 U.S.C. §502 enjoining and restraining Defendants from further infringement or broadcast of Plaintiff's copyrighted Original Work.

AS AND FOR A SECOND CAUSE OF ACTION
ACTAL DAMAGES FOR COPYRIGHT INFRINGEMENT

47. Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

48. Plaintiff is the sole and lawful proprietor of all rights, title and interest in and to the copyrighted Original Work.

49. Defendants had both direct and widely disseminated access to the Original Work by virtue of the Original Work being on the Steam site which defendants are members of, and via the Original Work being published with millions of views.

50. Defendants, without Plaintiff's authorization, knowledge or consent, willfully infringed on Plaintiff's Original Work by causing to be written, produced, and broadcast on live television and/or streamed via an on-demand streaming services, including without limitation DVD's, a strikingly and/or substantially similar derivative work entitled "Star Trek Discovery" – the Infringing Work—which is strikingly/substantially similar to Plaintiff's Original Work.

51. Defendant's acts are willful, intentional and purposeful, in violation and disregard of the Copyright Act.   Therefore, as a direct and proximate result, plaintiff is entitled to damages in an amount to be proven at trial.   At a minimum plaintiff is entitled to profits defendants derived from the infringement and exploitation thereof pursuant to 17 U.S.C.

Section 504(b), including an accounting and constructive trust with respect to such profits.

52. Accordingly, Defendants have infringed Plaintiff's copyright in the Original Work in direct violation and contravention of 17 U.S.C. §101 *et seq.* and 106, 501 *et seq* Plaintiff seeks impoundment of all copies of the Star Trek Discovery series and seeks to bar defendants from infringing on defendants' right to license said series.

53. Plaintiff seeks damages based on the profits derived from defendant's use of plaintiff's Original Work.  Said Original Work is an integral part of the Star Trek Discovery series and continues to be an integral part of that series.

54. Again, by reason of the foregoing, Plaintiff is entitled to actual damages and profits pursuant to 17 U.S.C. §504, in an amount to be determined at trial.


AS FOR A THIRD CAUSE OF ACTION

(ATTORNEY'S FEES AND COSTS)

55. Plaintiff restates and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

56. Plaintiff is the sole and lawful proprietor of all rights, title and interest in and to the copyrights Original Work.

57. Defendants had access to the Original Work by virtue of the Original Work being published with hundreds of thousands of views.

58. Defendants, without Plaintiff's authorization, knowledge or consent, willfully infringed on Plaintiff's Original Work by causing to be written, produced, and broadcasted on live television and streamed via an on-demand streaming service, including without limitation

DVD's, a derivative work entitled "Star Trek Discovery" – the Infringing Work—which is substantially similar to Plaintiff's Original Work.

59. Accordingly, Defendants have infringed Plaintiff's copyright in the Original Work in direct violation and contravention of 17 U.S.C. §101 *et seq.,* 106.

60.  Additionally, plaintiff is entitled to attorney's fees by virtue of the defendant's violation of plaintiff's copyright in and to the Original Work.

61. By reason of the foregoing, Plaintiff respectfully requests the recovery of all costs as well as, attorneys' fees in connection with the prosecution of this case pursuant to 17 U.S.C. §505.

## AS FOR A FOURTH CAUSE OF ACTION
### (ACCOUNTING)

62. Plaintiff restates and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

63. Pursuant to 17 U.S.C. §504, Plaintiff is entitled to recover all of Defendants' profits attributable to their acts of infringement.

64. Pursuant to 17 U.S.C. §504, Plaintiff is entitled to recover actual damages sustained by virtue of Defendants' profits attributable to their acts of infringement.

65. The amount of money due from Defendants is presently unknown to Plaintiff and cannot be ascertained without a detailed accounting by Defendants of all profits obtained from their marketing, distribution, national television broadcasting and//or streaming of the Infringing Work.

**WHEREFORE**, the Plaintiff respectfully requests this Court to enter a judgment against the Defendant for their willful, malicious, writing, producing, and broadcasting on live television and streamed on an on-demand streaming service, including without limitation, DVD's a derivative work entitled "Star Trek Discovery" – the Infringing Work – which is substantially similar to Plaintiff's Original Work which resulted in, and continues to result in, injuries to Plaintiff. Accordingly, Plaintiff respectfully requests that this Court:

a. Issue permanent injunction against the Defendants, and all other in active concert or participation with Defendants, from further broadcast/streaming of the Infringing Work or other infringement of Plaintiff's protected copyrighted Original Work;

b. Order the Defendants to recall and destroy all copies of the infringing work or any other derivatives of Plaintiff's Original Work, in whatever form they may exist;

c. Order Defendants to pay Plaintiff an amount to be determined at trial in actual damages and profits, plus interest, Pursuant to 17 U.S.C. §504. the exact amount to be determined at trial;

d. Order Defendant to pay Plaintiff both the costs of this action and the reasonable attorney's fees incurred by Plaintiff in prosecuting this action pursuant to 17 U.S.C. §505.

e. Order the imposition of a constructive trust over Defendant's profit which resulted from their infringement of Plaintiff's Original Work;

f. Order that Defendants provide Plaintiff a full and complete accounting of all profits obtained from their marketing, distribution, streaming and national television broadcasting and/or any other sales of the Infringing Work and any other amounts due and owing to Plaintiff as a result if Defendant's infringement; and

g. Grant Plaintiff such other and additional relief as the Court deems just and proper.

**Jury Demand**

Pursuant to Rule 38(b) of Federal Rules of Civil Procedure, Plaintiff respectfully demands that this proceeding be tried to a jury.

Dated: 1/14/2019

By: /s/John Johnson
John Johnson 4170
25 Broadway, 9th Floor
New York, NY 10004
john@jj-law.com
212-566-3019

By: /s/ Allan Chan 4248
30 Wall Street, 8th Floor
New York, N.Y. 10005
chanesq@outlook.com
212-561-5490