**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                                          :
ANAS OSAMA IBRAHIM ABDIN,                                  :
                                                          :
           Plaintiff,                                     :
                                                          :   No. 1:18-cv-07543-LGS
                   v.                                     :
                                                          :
CBS BROADCASTING, INC and/or CBS CORP.   :   Hon. Lorna G. Schofield
and/or CBS ALL ACCESS, and/or CBS         :
INTERACTIVE Netflix, INC.,                :
                                                          :
           Defendants.                                    :
                                                          :
-------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT


LOEB & LOEB LLP
Wook Hwang
Nathalie Russell
345 Park Avenue
New York, New York 10154
(212) 407-4000

*Attorneys for Defendants CBS Broadcasting Inc., CBS Corporation, CBS Interactive Inc., and Netflix, Inc.*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 3

I.  TARDIGRADES' UNIQUE AND WELL-KNOWN ABILITY TO SURVIVE IN
    SPACE ............................................................................................................................ 4

II. THE PARTIES' WORKS AND RESPECTIVE DEPICTIONS OF
    TARDIGRADES ......................................................................................................... 6

     A.  Plaintiff's *Tardigrades* Game Concept .............................................................. 6

         1.  The 2018 Treatment ...................................................................................... 7

         2.  The Video Compilation ................................................................................. 7

     B.  Defendants' *Star Trek: Discovery* Series ......................................................... 10

III. PLAINTIFF'S OTHER ALLEGED "SIMILARITIES" ................................................. 13

ARGUMENT .................................................................................................................. 14

I.  PLAINTIFF'S COPYRIGHT CLAIMS SHOULD BE DISMISSED WITH
    PREJUDICE FOR LACK OF SUBSTANTIAL SIMILARITY ..................................... 14

     A.  The Substantial Similarity Test .......................................................................... 15

     B.  There Are *No* Substantial Similarities Between the *Discovery* Series and
    the Protectable Elements of Plaintiff's Game ....................................................... 17

         1.  Plaintiff Does Not Own the Basic Concept of an Enlarged Space-
        Traveling Tardigrade .................................................................................... 17

         2.  None of the Other Random "Similarities" Identified by Plaintiff
        Are Actionable ............................................................................................. 20

II. PLAINTIFF'S COPYRIGHT CLAIMS AGAINST NETFLIX ARE
    INDEPENDENTLY BARRED BECAUSE THE COPYRIGHT ACT DOES NOT
    APPLY EXTRATERRITORIALLY ............................................................................ 23

III. PLAINTIFF'S CLAIM FOR ATTORNEYS' FEES INDEPENDENTLY FAILS
     BECAUSE PLAINTIFF'S COPYRIGHT REGISTRATION POSTDATES
     DEFENDANTS' *DISCOVERY* SERIES ................................................................. 24

IV. PLAINTIFF'S CLAIM FOR AN ACCOUNTING FAILS AS A MATTER OF
    LAW ........................................................................................................................... 25

CONCLUSION .............................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Murdoch,*
2011 U.S. Dist. LEXIS 79543 (S.D.N.Y. May 27, 2011),
*adopted by,* 2011 U.S. Dist. LEXIS 79503 (S.D.N.Y. July 14, 2011) .......................................21

*Alexander v. Murdoch,*
2011 U.S. Dist. LEXIS 79503 (S.D.N.Y. July 14, 2011),
*aff'd,* 502 F. App'x 107 (2d Cir. 2012) .......................................16

*Baiul v. NBC Sports,*
2016 U.S. Dist. LEXIS 52291 (S.D.N.Y. Apr. 19, 2016),
*aff'd,* 708 F. App'x 710 (2d Cir. 2017) .......................................25

*Canal+ Image UK, Ltd. v. Lutvak,*
773 F. Supp. 2d 419 (S.D.N.Y. 2011) .......................................16

*Davis v. Gap, Inc.,*
246 F.3d 152 (2d Cir. 2001) .......................................25

*Dean v. Cameron,*
53 F. Supp. 3d 641, 650-51 (S.D.N.Y. 2014) .......................................16, 20

*DiTocco v. Riordan,*
815 F. Supp. 2d 655 (S.D.N.Y. 2011),
*aff'd,* 496 F. App'x 126 (2d Cir. 2012) .......................................16, 20

*Eden Toys, Inc. v. Marshall Field & Co.,*
675 F.2d 498 (2d Cir. 1982) .......................................18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
499 U.S. 340 (1991) .......................................15

*Folio Impressions, Inc. v. Byer California,*
937 F.2d 759 (2d Cir. 1991) .......................................18

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
1996 U.S. Dist. LEXIS 18653 (S.D.N.Y. Dec. 16, 1996) .......................................24

*Gal v. Viacom Int'l, Inc.,*
518 F. Supp. 2d 526 (S.D.N.Y. 2007) .......................................3

*Green v. Harbach,*
2018 U.S. Dist. LEXIS 113608 (S.D.N.Y. July 9, 2018),
*aff'd,* 2019 U.S. App. LEXIS 3633 (2d Cir. Feb. 6, 2019) .......................................23

*Green v. Proctor & Gamble, Inc.*,
709 F. Supp. 418 (S.D.N.Y. 1989) ........................................................................... 19

*Hallford v. Fox Entm't Grp., Inc.*,
2013 U.S. Dist. LEXIS 19625 (S.D.N.Y. Feb. 13, 2013) ......................................... 16

*Hayuk v. Starbucks Corp.*,
157 F. Supp. 3d 285 (S.D.N.Y. 2016) ...................................................................... 22

*Hoehling v. Universal City Studios, Inc.*,
618 F.2d 972 (2d Cir. 1980) ...............................................................................15-16

*Hogan v. DC Comics*,
48 F. Supp. 2d 298 (S.D.N.Y. 1999) ........................................................................ 21

*Kaye v. Cartoon Network, Inc.*,
297 F. Supp. 3d 362 (S.D.N.Y. 2017) (Schofield, J.) ..................................3, 16, 20, 21

*Levitin v. Sony Music Entm't*,
101 F. Supp. 3d 376 (S.D.N.Y. 2015) .................................................................23, 24

*Lewinson v. Henry Holt & Co., LLC*,
659 F. Supp. 2d 547 (S.D.N.Y. 2009) ...................................................................... 21

*Magnoni v. Smith & Laquercia*,
483 F. App'x 613 (2d Cir. 2012) ................................................................................ 3

*Morris v. Wilson*,
189 F. Supp. 565 (S.D.N.Y. 1960), *aff'd*, 295 F.2d 36 (2d Cir. 1961) ..................... 21

*Nobile v. Watts*,
2018 U.S. App. LEXIS 27068 (2d Cir. Sept. 21, 2018) ........................................... 16

*Ollie v. Domino's Pizza, Inc.*,
1997 U.S. Dist. LEXIS 12781 (S.D.N.Y. Aug. 22, 1997) ........................................ 19

*Perry v. Mary Ann Liebert, Inc.*,
2018 U.S. Dist. LEXIS 93513 (S.D.N.Y. June 4, 2018),
*reconsideration denied by*, 2018 U.S. Dist. LEXIS 107742
(S.D.N.Y. June 26, 2018) ...................................................................................15, 17

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
602 F.3d 57 (2d Cir. 2010) ...............................................................................*passim*

*Psihoyos v. Nat'l Geographic Soc'y*,
409 F. Supp. 2d 268 (S.D.N.Y. 2005) .................................................................17-18

*Roberts v. Keith*,
2009 U.S. Dist. LEXIS 101412 (S.D.N.Y. Oct. 23, 2009) .................................23-24

*Silberstein v. John Does 1-10*,
    242 F. App'x 720 (2d Cir. 2007) ............................................................................... 18

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    2016 U.S. Dist. LEXIS 101119 (S.D.N.Y. Aug. 2, 2016) ........................................ 25

*Tarshis v. Riese Org.*,
    211 F.3d 30 (2d Cir. 2000) ........................................................................................ 3

*Twentieth Century Fox Film Corp. v. Marvel Enters.*,
    155 F. Supp. 2d 1 (S.D.N.Y. 2001), *aff'd in part, rev'd in part on other grounds*,
    277 F.3d 253 (2d Cir. 2002) ...................................................................................... 3

*Twentieth Century Fox Film Corp. v. Marvel Enters.*,
    220 F. Supp. 2d 289 (S.D.N.Y. 2002) ...................................................................... 3

*United States v. Bari*,
    599 F.3d 176 (2d Cir. 2010) ...................................................................................... 5

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986) ...................................................................................... 16

*Warner Bros., Inc. v. ABC*,
    720 F.2d 231 (2d Cir. 1983) ................................................................................22-23

*Weber v. Geffen Records*,
    63 F. Supp. 2d 458 (S.D.N.Y. 1999) ...................................................................... 25

*Williams v. A&E TV Networks*,
    122 F. Supp. 3d 157 (S.D.N.Y. 2015) ...................................................................... 3

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996) ............................................................................*passim*


**Statutes and Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 1

17 U.S.C. § 412(2) ........................................................................................................ 24

17 U.S.C. § 505 ............................................................................................................ 24

Defendants CBS Broadcasting Inc., CBS Corp., CBS Interactive Inc., CBS All Access[1] (collectively, "CBS") and Netflix, Inc. ("Netflix") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Third Amended Complaint ("TAC") of Plaintiff Anas Osama Ibrahim Abdin ("Plaintiff") for failure to state a claim upon which relief may be granted.

## PRELIMINARY STATEMENT

Tardigrades are near-indestructible microscopic creatures that exist in real life, and have been a source of public fascination in the scientific and science fiction communities since a 2007 experimental discovery that tardigrades have the unique ability to survive unprotected in space. As with many other works following that discovery, Defendants incorporated a tardigrade-like creature in their television series *Star Trek: Discovery* ("*Discovery*"), the latest installment in the storied *Star Trek* franchise. Plaintiff likewise incorporated a tardigrade in his unreleased video game concept *Tardigrades*, most prominently (and almost exclusively), in a 13-second video clip he first posted to the Internet in July 2017 just two months before *Discovery* first aired. By this action, Plaintiff claims that Defendants have infringed his work based on the frivolous premise that he owns an exclusive monopoly on the right to create space-based fictional works that depict enlarged tardigrades traveling in space. Relying on this premise, and a handful of selectively plucked "similarities" in the approximately 11 hours of *Discovery*'s first season, Plaintiff has asserted three claims for copyright infringement (seeking different remedies) and a common-law claim for an accounting. Each of these claims fails completely, and should be dismissed with prejudice.

First, Plaintiff's copyright claims fail as a matter of law because *Discovery* is not substantially similar to *any* protectable elements of Plaintiff's works. Indeed, the primary "similarities" that exist upon a comparison of the parties' works are features that exist in real-life

---

[1] Although CBS All Access is named as a Defendant in the caption, it is not a legal entity and no allegations are asserted against it in the TAC.

tardigrades that are not original to Plaintiff, and that are not protectable at all. Once these features are removed from the analysis, the only remaining similarities between the parties' works are that both tardigrades are enlarged from their microscopic size and are able to travel unprotected in space — concepts that flow naturally and predictably from the basic idea of including a space-resistant tardigrade in a space-based fictional work, and that therefore constitutes classic *scenes a faire* that enjoy no copyright protection. Indeed, these commonalities are not original to Plaintiff either, as numerous works predating his have done the very same thing with tardigrades. The only other similarities Plaintiff identifies (or that exist) are random, scattershot and trivial similarities that courts routinely reject in the substantial similarity analysis, and that cannot establish *substantial* similarity as a matter of law.

<u>Second</u>, Plaintiff's copyright claims against Netflix, *Discovery*'s international distributor, are independently barred because Plaintiff does not allege any predicate and infringing act occurring in the United States, as is necessary for the Court to exercise jurisdiction over extraterritorial copyright infringement.

<u>Third</u>, Plaintiff's claim for attorneys' fees pursuant to the Copyright Act fail for the additional and independent reason that statutory fees are available where the alleged infringement commenced *before* the effective date of copyright registration. Here, Plaintiff's sole registration has a June 28, 2018 effective date (TAC, Ex. A), well *after* the allegedly infringing season of *Discovery* first aired, and concluded.

<u>Fourth</u>, and finally, Plaintiff's common law claim for an accounting fails for two separate reasons: (1) it is based solely on Defendants' alleged copyright infringements, and is thus preempted; and (2) Plaintiff does not, and cannot, allege the fiduciary relationship between him and Defendants that is a necessary element to maintain a claim for an accounting under New York law.

Plaintiff has represented to the Court that he will not seek further leave to amend the complaint (already in its fourth iteration) in response to the instant motion. (DE 45 at 5; 1/8/19 Tr. (DE 52) at 15:14-22). In any event, no amount of fact-finding or further amendment can change the content of the subject works, nor alter the conclusion that each of Plaintiff's claims is foreclosed as a matter of law. Accordingly, the TAC should be dismissed in its entirety, with prejudice.

## STATEMENT OF FACTS

The facts set forth herein are taken from the allegations; materials referenced and/or relied upon in the TAC, including the works at issue; as well as publicly available materials of which judicial notice may be taken.[2] Documents and materials relevant to this motion that the Court may properly consider are annexed to the accompanying Declaration of Wook Hwang ("Hwang Decl.").

---

[2] On a motion to dismiss a copyright claim, the law in this Circuit is settled that the Court can and should review the parties' works to resolve the issue of substantial similarity as a matter of law. *See, e.g., Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (on motions to dismiss "[i]n copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings") (citations and quotation marks omitted); *Kaye v. Cartoon Network, Inc.*, 297 F. Supp. 3d 362, 366 (S.D.N.Y. 2017) (Schofield, J.); *Williams v. A&E TV Networks*, 122 F. Supp. 3d 157, 160 (S.D.N.Y. 2015).

Additionally, on a motion to dismiss, the Court may also consider materials "of which judicial notice may be taken," *Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000), including publicly available materials on the Internet showing, in this case, that the concept of tardigrades in space predates Plaintiff's game concept and is thus not original to his work. *See, e.g., Twentieth Century Fox Film Corp. v. Marvel Enters.*, 155 F. Supp. 2d 1, 41 & n.71 (S.D.N.Y. 2001) (on motion to dismiss, taking judicial notice of prior works showing that plaintiff's plot scenario "is common to fiction in general and science fictional works in particular"), *aff'd in part, rev'd in part on other grounds*, 277 F.3d 253 (2d Cir. 2002); *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 546-47 (S.D.N.Y. 2007) (taking judicial notice of third-party novels to determine stock elements of the thriller genre); *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 220 F. Supp. 2d 289, 296 n.9 (S.D.N.Y. 2002) (taking judicial notice of websites on motion to dismiss); *Magnoni v. Smith & Laquercia*, 483 F. App'x 613, 616 (2d Cir. 2012) (explaining that District Court properly took judicial notice of websites).

# I.   TARDIGRADES' UNIQUE AND WELL-KNOWN ABILITY TO SURVIVE IN SPACE

Tardigrades (commonly known as "water bears") are near-microscopic animals discovered in the 18th century known for their ability to survive in Earth's most inhospitable environments and, indeed, in space.  As is relevant here, tardigrades have been discussed in the scientific literature for their unique ability to survive unprotected in space since at least 2007, when Swedish and German scientists launched the Tardigrades in Space (TARDIS) project to study the effects of space radiation exposure on tardigrades aboard the European Space Agency's FOTON-M3 mission.[3]

Since that time — well before Plaintiff alleges to have first posted his game materials onto the Internet in May 2014 (TAC ¶ 9) — the concept of tardigrades in space (and traveling in space) has been explored and discussed extensively within the scientific community.  For example, in 2009, the Russian Federal Space Agency set out to carry the Living Interplanetary Flight Experiment (LIFE) to take samples of Earth life, including tardigrades, to the innermost moon of Mars.[4]  In May 2011, tardigrades were carried aboard the NASA space shuttle Endeavor for further space-based experimentation by the Italian Space Agency, as discussed in a contemporaneous BBC article that includes the following image of a tardigrade:[5]

---

[3] *See* K. Ingemar Jönsson et al., *Tardigrades survive exposure to space in low Earth orbit*, 18 Current Biology 17 (Sept. 9, 2008) (available at https://www.sciencedirect.com/science/article/pii/S0960982208008051) (Hwang Decl. ¶ 2, Ex. 1); http://tardigradesinspace.blogspot.com/ (discussing TARDIS program and linking to relevant articles from 2007-2009) (Hwang Decl. ¶ 3, Ex. 2); Joseph Stromberg, *How Does the Tiny Waterbear Survive in Outer Space?*, Smithsonian Magazine (Sept. 11, 2012) (available at https://www.smithsonianmag.com/science-nature/how-does-the-tiny-waterbear-survive-in-outer-space-30891298/) (Hwang Decl. ¶ 4, Ex. 3).

[4] *See* JR Minkel, *Phobos-Grunt Probe to Put Microbial Life in Mars Orbit*, Scientific American (Sept. 1, 2009) (available at https://www.scientificamerican.com/article/phobos-grunt-mars/#googDisableSync) (Hwang Decl. ¶ 5, Ex. 4).

[5] *See* Emma Brennand, *Tardigrades: Water Bears in Space*, BBC (May 17, 2011) (available at http://www.bbc.co.uk/nature/12855775) (Hwang Decl. ¶ 5, Ex. 4).



A simple Internet search for "tardigrades" reveals dozens, if not hundreds, of articles concerning tardigrades' ability to survive in space.[6]

The fascination with tardigrades has extended beyond the scientific community to works of fiction (and layperson non-fiction), including numerous examples that predate Plaintiff's *Tardigrades* game concept.  Among them:

- Tony DiTerlizzi's 2010 book titled *The Search for WondLa*, an inter-planetary children's tale about aliens and foreign lands, features a character named Otto, an enlarged tardigrade described as "gargantuan" and "behemoth," and with a brethren herd of "giant tardigrades" described as "[l]arge glowing life-forms" that are "carried by strange and wondrous currents."  (*See* Hwang Decl. ¶ 6, Ex. 5).

- The 2013 book titled *The Science of Discworld IV: Judgment Day* by Sir Terry Pratchett, Ian Stewart and Jack Cohen, a story of wizards traveling between Discworld and Roundworld, features a discussion of tardigrades' capacity to resist radiation.  (*See* Hwang Decl. ¶ 7, Ex. 6).

- The fifth season of the television series *Adventure Time* includes an episode that aired in January 2014 involving alien creatures in the Land of Ooo, which features a "Grass Bear" character based on a tardigrade that features its eight appendages and unique ringed mouth structure.  (Hwang Decl. ¶ 8, Ex. 7).

- The non-fiction television series *Cosmos: A Spacetime Odyssey* presented by Neil deGrasse Tyson includes two episodes that aired in March and May of 2014, respectively, featuring descriptions of tardigrades' unique ability to survive in space.  (*See* Hwang Decl. ¶ 9, Ex. 8).

---

[6] The Court can take judicial notice of such information for the purpose of confirming the widespread interest in tardigrades among the scientific community.  *See* fn 2 *supra*; *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (affirming judicial notice of Internet materials and explaining that "a judge need only take a few moments to confirm his intuition by conducting a basic Internet search").

- Beginning on May 9, 2015 — before Plaintiff posted any of his *Tardigrades* works on the Internet (*see* Statement of Facts, Section II.A.2 *infra*) — animator Ian Michael Miller posted a series of animated comedic shorts featuring a humanoid space-faring tardigrade dubbed "Captain Tardigrade, Defender of the Multiverse" to YouTube. (*See* Hwang Decl. ¶ 10, Ex. 9).

Indeed, the idea of tardigrades in connection with the *Star Trek* franchise was posited by the well-known publication Scientific American in a 2013 article titled *How Tardigrades Saved the Enterprise* (Hwang Decl. ¶ 11, Ex. 10),[7] well before Plaintiff created his *Tardigrades* game concept.

## II.   THE PARTIES' WORKS AND RESPECTIVE DEPICTIONS OF TARDIGRADES

"In copyright infringement actions, the works themselves supersede and control contrary descriptions of them … [and] what is required is only a visual comparison of the works." *Peter F. Gaito*, 602 F.3d at 64 (citations and quotation marks omitted).   Accordingly, the following descriptions are provided for the Court's convenience only.

### A.   Plaintiff's *Tardigrades* Game Concept

Plaintiff is the creator of an unreleased but allegedly "greenlit" video game called *Tardigrades* — originally titled *Epoch* — which he posted in the form of "articles, artwork and audio/video" on a few Websites between May 2014 and July 2017. (TAC ¶ 9). Plaintiff has compiled these materials together in a video file with the filename "Exhibit K-H" (the "Video Compilation"), first showing an approximately 30-minute compilation of 23 separate YouTube videos (TAC ¶ 11) with associated YouTube URLs, and then running through approximately 13 additional minutes of video showing static blog posts from the Websites https://www.adventuregamestudio.co.uk and http://anas-tronaut.blogspot.com. None of the videos or blog posts comprising the Video Compilation are alleged to be registered for copyright. Plaintiff's game concept is allegedly distilled into a treatment annexed as Exhibit A to the TAC (the

---

[7] *See* Kyle Hill, *How Tardigrades Saved the Enterprise*, Scientific American (May 31, 2013) (opining that Captain Kirk should have used tardigrades to save USS Enterprise in 2013 film *Star Trek: Into Darkness*) (available at https://blogs.scientificamerican.com/but-not-simpler/how-tardigrades-saved-the-enterprise/).

"2018 Treatment"; DE 49-2).  (*See* TAC ¶ 1).  Plaintiff registered the 2018 Treatment for copyright on June 28, 2018 (DE 49-1), after *Discovery* first aired in September 2017.  (TAC ¶ 9).

Together, the Video Compilation and 2018 Treatment comprise the totality of works Plaintiff claims have been infringed.  (TAC ¶¶ 1, 11, 25).

### 1. The 2018 Treatment

The 2018 Treatment describes a single-player user-driven video game set on a space station orbiting Jupiter in the year 20,000 BC, when Earth's civilizations are "about to discover intergalactic travel."  (2018 Treatment at 1).  The treatment anticipates that the video game will include "a plot twist" and several themes ("slavery, secrecy, and espionage"), but provides no details concerning the plot or themes.  It also includes short vignettes briefly describing seven of the game's characters, with no description spanning more than a few sentences.  (*Id.* at 3-6).

With respect to tardigrades, the 2018 Treatment depicts a blue tardigrade enveloping a man (the Carter character) on its first and eighth pages, but provides little explanation of tardigrades' role in the game.  In a few pages of comic-book style artwork, a boy is apparently bitten by a tardigrade, and the 2018 Treatment notes in comic book bubbles that tardigrades can survive in "the vacuum of open space and solar radiation."  (*Id.* at 13-15).  However, this comic-book artwork appears nowhere in the Video Compilation of Plaintiff's Internet-posted materials.

### 2. The Video Compilation

As with the 2018 Treatment, the videos and blog posts contained in the Video Compilation provide little information concerning the plot elements to be explored in Plaintiff's video game.  Rather, it consists of short, disjointed video teasers and one-off blog posts with no cohesive plot framework, other than that the game centers on the space station *Marsi-3*.  The only other overarching theme running through these materials is that the game will feature pharaonic Egyptian elements, in keeping with the ancient timeline in which the game is based.  For example, the

Tardigrades logo is "a combination of the water bear posing as the ancient Egyptian scarab holding a crook and a flail, accessorized with two wings." (Video Compilation at 40:02). The concept of Earth's Egyptian ancestors having been advanced space travelers has of course been extensively explored in the science fiction genre, including in the *Stargate* film and television franchise.

The Video Compilation includes scant depictions of tardigrades in any of the materials Plaintiff posted on the Internet. As an initial matter, the blog posts (Video Compilation at 29:49-42:39) feature no tardigrades at all, except as shown in the videos. With respect to the videos, the first set of 14 videos relate to Plaintiff's original *Epoch* game concept (*id.* at 0:00-20:18), none of which depict any tardigrades.

Only the final nine (9) videos, lasting a total of less than 10 minutes (*id.* at 20:19-29:49), relate to Plaintiff's rebranded *Tardigrades* game concept. The opening monologue from the first *Tardigrades*-related video (*id.* at 20:22) takes directly from the opening monologue of the 1984 David Lynch film *Dune* (based on Frank Herbert's novel of the same name), with a female narrator stating: "The beginning is a very delicate time. Know then that it is the year 20,191...."[8] This first *Tardigrades*-related video was posted to YouTube on May 16, 2015 (*see* https://www.youtube.com/watch?v=BIYbDHt5EfU; Hwang Decl. ¶ 12, Ex. 11), and posted on Plaintiff's own blog on May 17, 2015. (*See* Video Compilation at 39:30).

In totality, the approximately 10-minute sequence of *Tardigrades* videos contains only two short video snippets depicting Plaintiff's tardigrade.

First, several of the videos depict a small, poorly defined tardigrade fading into the background, in the same closing sequence snippet that lasts less than one second in each instance (Video Compilation at 23:24, 24:29, 25:51, 26:40, 28:06, 28:37 and 29:33):

---

[8] The opening monologue of *Dune* begins, "The beginning is a very delicate time. Know then that it is the year 10,191..." (*See* https://www.youtube.com/watch?v=6H5jeLxUy-0).



The earliest of the videos including this snippet (available at the above-referenced URL, https://www.youtube.com/watch?v=y1pLIIa_WfM) was posted to YouTube on July 29, 2015. (Hwang Decl. ¶ 13, Ex. 12).

<u>Second</u>, in just one of the *Tardigrades* related videos, there is a 13-second sequence in which an enlarged blue tardigrade appears behind Plaintiff's Carter character, hugs him from behind and drifts off into space (Video Compilation at 29:20-33):



This "tardigrade-hug" sequence appears only in this single video (available at the above-referenced URL, https://www.youtube.com/watch?v=ikHgCwM84LY), which was posted to YouTube on July 12, 2017, just two months before *Discovery* aired. (Hwang Decl. ¶ 14, Ex. 13). This is the same sequence depicted on the first and eighth pages of Plaintiff's 2018 Treatment. (TAC, Ex. A).

As with the treatment, little information is provided in the Video Compilation concerning the significance of the tardigrade. Only a single blog post provides any relevant information, noting the proven scientific facts that tardigrades can "survive extreme conditions of radiation and the vacuum of space." (Video Compilation at 38:49). Apparently for these reasons, Plaintiff's tardigrade-hug system works to protect the human occupant while floating through space. Though this blog post references "space travel," no mention is made anywhere in the 2018 Treatment or in any of the materials contained in the Video Compilation that Plaintiff's tardigrade is capable of "instantaneous" space travel, as incorrectly alleged in the complaint. (TAC ¶ 24).

**B.      Defendants' *Star Trek: Discovery* Series**

Defendants own the rights to *Discovery*, the newest addition to the *Star Trek* franchise. *Discovery* tells various interweaving storylines about the adventures of the starship Discovery and its crew through the 15 episodes of its first season, which aired between September 2017 and February 2018.[9] The series begins with the commencement of a war with the Klingons prompted by the actions of one of *Discovery*'s main characters, Michael Burnham, a Vulcan-raised human played by an African-American female. The Klingon war is the underlying thread throughout most of the season. Later episodes also focus on the starship Discovery's attempts to escape a mirror universe in which they have become stranded.

One of the many storylines enmeshed within these two primary story arcs involves a rescued creature named Ripper (of a species considered cousin to the Earth-based tardigrades), whose DNA is used to aid the functioning of the starship Discovery's experimental "mycelial spore network drive" space travel technology. The mycelial drive — referred to as the DASH (Displacement Activated Spore Hub) drive — is an experimental propulsion system that uses mycelial spores as its

---

[9] These 15 episodes are included in the CDs attached as Exhibit 14 to the Hwang Decl. Because space limitations prevent a full explication of the approximately 11 hours of content making up these episodes, the description herein focuses on the appearance of the Ripper tardigrade character in episodes 4 and 5.

power source.  The Federation has discovered a type of fungus called mycelium that has a root system extending "throughout subspace," which can theoretically be used as a platform to "jump" to any location in the universe.  Lieutenant Paul Stamets leads the DASH research team aboard the Discovery, one of two starships equipped with this technology.  To power its DASH drive, the Discovery maintains a large greenhouse full of spore-producing mycelium.  However, as described in episodes 3 and 4, the Discovery is faced with the problem that its experimental drive can only jump short distances reliably across the spore network, defeating its purpose.

Ripper, a creature resembling a tardigrade, makes its first appearance near the beginning of episode 4.  (Hwang Decl., Ex. 14, Ep. 104 at 7:30).  It was discovered aboard the starship Glenn (the other ship equipped with DASH technology) when, in episode 3, the Discovery investigates the Glenn's destruction and learns that the ship was destroyed by an unidentified creature.  The audience learns in episode 4 that the creature was Ripper.  Assigned by Captain Lorca to study it, Burnham determines that Ripper — a large greenish-brown animal with four pairs of clawed limbs and body armor segments with various tentacles — is a cousin of the Earth species tardigrade:



While everyone else naturally assumes that Ripper is inherently violent (hence the moniker), Burnham comes to understand that Ripper is a peaceful, sensitive creature and that its acts of violence have been in self-defense.  Burnham deduces through her investigation that Ripper has an affinity for mycelial spores, a hypothesis she confirms and shares with Lieutenant Stamets.  (*Id.* at

11

31:15-35:48).  Through further investigation, Burnham and Stamets determine that Ripper was used by the Glenn crew as the missing link necessary to operate the Glenn's own DASH drive.  (*Id.*).  As later described in episode 5, Ripper is able to overcome the mycelial spore drive's limitations because, "[l]ike its microscopic cousins on Earth, the tardigrade is able to incorporate foreign DNA into its own genome via horizontal gene transfer.  When Ripper borrows DNA from the mycelium, he's granted an all-access travel pass."  (Hwang Decl., Ex. 14, Ep. 105 at 20:09-21:01).

Having made this discovery, Stamets connects Ripper to the DASH drive to facilitate several mycelial jumps in episodes 4 and 5.   However, Burnham becomes concerned when it becomes apparent that the jumps are taking an adverse toll on Ripper.   After one jump made in an effort to rescue Captain Lorca from the Klingons, Ripper enters a state of "cryptobiosis," a process by which it reduces its body water content to less than 1% and curls up into a self-protective ball (*id.* at 29:38-30:50, 42:33-43:00):



Ripper is depleted and unable to move.  With the help of medical officer Hugh Culber, Lieutenant Stamets's partner, Burnham convinces Stamets to find an alternative means to run the drive.   Under pressure to save Captain Lorca, Stamets injects himself with Ripper's DNA and connects himself to the DASH drive in place of Ripper.   After Stamets's successful jump and Captain Lorca's rescue, the Discovery crew learn that they have an alternative means of operating the mycelial spore drive.  At the conclusion of episode 5, Burnham thus releases Ripper into open space, and Ripper departs through the subspace mycelial spore network.  (*Id.* at 42:08-43:27).

Episodes 4 and 5 are the only episodes of the 15-episode series in which Ripper (the only tardigrade-like creature in *Discovery*) makes an appearance.  As shown in the images above, unlike Plaintiff's tardigrade, Ripper is not blue, and it is only the mycelial spores in which Ripper at times appears that are blue.  Unlike Plaintiff's tardigrade, *Discovery* does not employ a tardigrade-hug method, but rather uses the tardigrade's DNA to navigate a universal subspace mycelial spore network that has *no* analog in Plaintiff's work.

In sum, other than the common use of a tardigrade, the only "similarities" that exist between the tardigrade as depicted in episodes 4 and 5 of *Discovery* and in Plaintiff's 13-second clip (Video Compilation at 29:20-33) is that both tardigrades are enlarged and can move through space.  Space-faring tardigrades — including enlarged fictional tardigrades — are, of course, not original to Plaintiff.  (*See* Hwang Decl., Exs. 1-10).

## III.    PLAINTIFF'S OTHER ALLEGED "SIMILARITIES"

In addition to the common use of an enlarged space-faring tardigrade, Plaintiff identifies a few other purported "similarities" alleged to exist between his works and random elements plucked from the approximately 11 hours comprising *Discovery*'s first season.  These are identified in paragraphs 27-30 of the TAC, and in Exhibit B (DE 49-3) and Exhibit I (a video file) annexed to the TAC.  In their entirety, these "similarities" are as follows:

- Uniforms:  Plaintiff claims the uniforms depicted in the parties' respective works are substantially similar because they have similar colors — including, for example, white for the medical officers — and because the space suits used in the parties' works both have "egg-shaped" helmets.  (TAC ¶¶ 30, 30(k); Ex. I at 4:21-5:06).

- Stock Character Elements:  Plaintiff claims that the works share substantially similar characters in having: (i) a "Blond White Male" who works in the field of biology (in different fields); (ii) a "darker complexion homosexual male with black hair" and facial hair (of different ethnic backgrounds); (iii) an African-American female; and (iv) a redhead.  (TAC ¶¶ 30(a-e); Ex. I at 1:46-2:42).

- Homosexual Relationship:  Plaintiff claims that *Discovery* wrongfully portrays a homosexual male relationship because his game concept also includes a homosexual male relationship.  (TAC ¶ 29; Ex. I at 2:43-3:11).

- Floating Dots Surrounding Man:  Plaintiff claims that *Discovery* is similar to his *Tardigrades* game concept because, in one video sequence, Stamets appears in the Discovery's mycelial spore chamber surrounded by floating mycelial spores, while in Plaintiff's work his Carter character is depicted as floating in a dotted blue orb.  (TAC ¶¶ 27, 30(h); Ex. I at 0:00-0:15).  Plaintiff's works provide no explanation as to what this blue orb represents, and Plaintiff makes no claim that it is comprised of mycelial spores. The claimed similarity thus amounts to nothing more than the common portrayal of a man surrounded by blue and white dots (one sitting in a chamber, the other floating in space).

- "Ethereal" Travel:  Plaintiff claims *Discovery* is similar to his *Tardigrades* game concept because both depict individuals traveling "ethereally" in space.  (TAC ¶ 30(i-j); Ex. I at 3:12-4:20).  In *Discovery*, Burnham uses headgear to "travel" across 1,000 light years in mind only, through a special form of Vulcan mind-meld, whereas in Plaintiff's work a shimmering character (apparently Carter) is simply walking on hexagonal stepping stones situated without explanation in a space-based "astro-plain."

  Apparently to manufacture the appearance of similarity, Plaintiff further claims that his character enters this "astro-plain" by donning head gear like Burnham (TAC ¶ 30(j); Ex. I at 3:33-3:43).  But a review of Plaintiff's own materials shows that Plaintiff has combined two unrelated video "gif" files that appear separately in his blog posts — one showing his character donning headgear, and a separate video depicting the "astro-plain" walk.  (*See* Video Compilation at 32:58 and 33:06).  In other words, the video showing his character donning headgear is not, in fact, associated with the "astro-plain" walk.[10]

- Ship-Based "Emitter":  Plaintiff claims that *Discovery* wrongfully uses the word "emitter" to describe a ship-based emitter, because his work also contains a ship-based emitter that is also called an "emitter."  (TAC ¶ 30(f); Ex. I at 0:16-1:04).

Together, these are *all* of the purported "similarities" Plaintiff is able to identify between the voluminous set of materials comprising his Video Compilation (and 2018 Treatment) and the approximately 11 hours of *Discovery*'s first season.

## ARGUMENT

## I.  PLAINTIFF'S COPYRIGHT CLAIMS SHOULD BE DISMISSED WITH PREJUDICE FOR LACK OF SUBSTANTIAL SIMILARITY

Plaintiff asserts three "causes of action" for copyright infringement, each based on the same alleged infringement, but seeking the separate remedies of a "Permanent Injunction" (First Cause of

---

[10] Plaintiff's juxtaposition of unrelated videos is confirmed by visiting the blog posts identified in the relevant portions of the Video Compilation directly.  *See* https://www.adventuregamestudio.co.uk/forums/index.php?topic=50444.540; https://www.adventuregamestudio.co.uk/forums/index.php?topic=50444.600).

Action); "Actual Damages" (Second Cause of Action); and "Attorney's Fees and Costs" (Third Cause of Action).   These effectively constitute a single claim for copyright infringement, and all fail for the same reason: the parties' works are not substantially similar as a matter of law.

A.    **The Substantial Similarity Test**

To establish a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).   With respect to the second element, a plaintiff must prove not only that "the defendant has actually copied the plaintiff's work," but also that "the copying is *illegal* because a substantial similarity exists between the defendant's work and the *protectible* elements of plaintiff's."[11]   *Peter F. Gaito*, 602 F.3d at 63 (emphasis added).   Thus, in making the substantial similarity determination, courts in the Second Circuit apply the "more discerning" ordinary observer test in cases where, as here, a plaintiff's work contains both protectable and unprotectable elements.   This test requires the Court "to extract the unprotectible elements from … consideration and ask whether the protectible elements, *standing alone*, are substantially similar" to the allegedly infringing work.   *Id.* at 66 (emphasis added).

"It is 'a principle fundamental to copyright' law that 'a copyright does not protect an idea,'" *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (citation omitted), only an author's original expression of that idea.   Similarly, "copyright law does not protect facts, including scientific facts, because they do not owe their origin to an act of authorship."   *Perry v. Mary Ann Liebert, Inc.*, 2018 U.S. Dist. LEXIS 93513, *14 (S.D.N.Y. June 4, 2018) (citation and quotation marks omitted), *reconsideration denied by*, 2018 U.S. Dist. LEXIS 107742 (S.D.N.Y. June 26, 2018); *see also, e.g., Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980) (each defendant "had the

---

[11] For purposes of this motion only, Defendants do not challenge access to Plaintiff's works and actual copying thereof.   *See, e.g., Peter F. Gaito*, 602 F.3d at 63 (explaining that, "for purposes of defendants' motion to dismiss, the district court assumed (as do we) that actual copying by defendants occurred," and affirming dismissal for lack of substantial similarity).

right to avail himself of the facts contained in Hoehling's book and to use such information, whether correct or incorrect, in his own literary work."). "[A]lso unprotectible are scènes à faire, which [the Second Circuit has] described as sequences of events which necessarily follow from a common theme," as well as "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Nobile v. Watts*, 2018 U.S. App. LEXIS 27068, at *3 (2d Cir. Sept. 21, 2018) (citation and quotation marks omitted). In other words, under the scènes à faire doctrine, copyright protection does not extend to "'stock' themes commonly linked to a particular genre." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986).

In effect, "the discerning observer test instructs that similarities attributable to [such] unprotectible elements may as well not be similarities at all." *Canal+ Image UK, Ltd. v. Lutvak*, 773 F. Supp. 2d 419, 440 (S.D.N.Y. 2011). After extracting such unprotectible elements, courts ask whether the "works as a whole [are] substantially similar," *Williams*, 84 F.3d at 590, by examining "similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting…." *Id.* at 588.

Applying these standards, courts in this Circuit routinely dismiss copyright claims on the pleadings where a comparison of the works at issue shows that "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or [that] no reasonable jury, properly instructed, could find that the two works are substantially similar." *Peter F. Gaito*, 602 F.3d at 63 (citations and quotation marks omitted); *see also, e.g., Nobile v. Watts*, 2018 U.S. App. LEXIS 27068, at *6-7; *Kaye*, 297 F. Supp. 3d at 371-72 (Schofield, J.); *Dean v. Cameron*, 53 F. Supp. 3d 641, 650-51 (S.D.N.Y. 2014); *Hallford v. Fox Entm't Grp., Inc.*, 2013 U.S. Dist. LEXIS 19625, at *19 (S.D.N.Y. Feb. 13, 2013); *Alexander v. Murdoch*, 2011 U.S. Dist. LEXIS 79503, at *3-4 (S.D.N.Y. July 14, 2011), *aff'd*, 502 F. App'x 107 (2d Cir. 2012); *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 666 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012).

**B.**      **There Are *No* Substantial Similarities Between the *Discovery* Series and the Protectable Elements of Plaintiff's Game**

1.      **Plaintiff Does Not Own the Basic Concept of an Enlarged Space-Traveling Tardigrade**

Distilled against the parties' actual works (*Peter F. Gaito*, 602 F.3d at 64), the crux of Plaintiff's copyright claims (TAC ¶¶ 24, 26) amounts to the contention that *Discovery*'s Ripper character infringes on his purportedly "novel" use of a space-faring tardigrade in the only depictions appearing in his works: the less-than-one-second sequence of a tardigrade fading into space (*e.g.* Video Compilation at 23:24) was first posted to the Internet on July 29, 2015 (Hwang Decl., Ex. 12), and the 13-second clip depicting the tardigrade-hug sequence (Video Compilation at 29:20-33) that was first posted on July 12, 2017 (Hwang Decl., Ex. 13).   That fundamental premise fails completely.

As an initial matter, a visual comparison of the parties' works shows that any similarities that do exist are based on the real-world tardigrade, a creature with eight appendages and a uniquely round mouth:

|  Actual Tardigrade  | Plaintiff's Tardigrade | *Discovery*'s Ripper |
| :---: | :---: | :---: |



The scientific fact that tardigrades have these characteristic features is not subject to copyright protection, for the fundamental reason that they are not original to Plaintiff.  *See, e.g., Perry*, 2018 U.S. Dist. LEXIS 93513, at *14 ("copyright law does not protect facts, including scientific facts, because they do not owe their origin to an act of authorship") (citation and quotation marks omitted).   More directly, "the characteristics of an object as it occurs in nature … are not

protectable." *Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 275 (S.D.N.Y. 2005); *see also Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 765-66 (2d Cir. 1991) (no infringement of rose design because "by the rose's very nature one artist's rendering of it will closely resemble another artist's work").

Beyond the unprotectable physical characteristics of actual tardigrades, the obvious differences between the tardigrades' depictions becomes apparent upon a review of the parties' works, and overwhelm any other similarities that might exist (Plaintiff identifies none). *See Silberstein v. John Does 1-10*, 242 F. App'x 720, 722 (2d Cir. 2007) (no substantial similarity between squirrel like characters called "Sqrat" and "Scrat," because "[plaintiff's] Sqrat is a rather crudely drawn two-dimensional, monochromatic, static character, whereas defendants' Scrat is portrayed as existing and moving in three dimensions, and his fur, nose, eyes, mouth, and extremities are rendered in lifelike detail and realistic color and shade" in defendant's film) (citation and quotation marks omitted); *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir. 1982) (no infringement where "any similarity between [the parties' snowmen] would appear to the ordinary observer to result solely from the fact that both are snowmen").

Once these unprotected public domain elements are extracted from the analysis, all that remains of this purportedly central "similarity" is that the parties have enlarged the tardigrade and given it the ability to travel in its well-documented space environment. Neither of these adaptations are original to Plaintiff either, as both enlarged tardigrades (*see, e.g.,* Hwang Decl. ¶ 6, Ex. 5 (excerpts from 2010 children's novel *The Search for WondLa*)) and space-traveling tardigrades (*see, e.g., id.* ¶ 10, Ex. 9 (also available at https://www.youtube.com/watch?v=OUrz4CtGuOM)) have been featured in third-party works well *before* Plaintiff posted his 13-second clip in July 2017, including the following:



But even ignoring these preexisting works entirely, and assuming that Plaintiff had been the first to come up with the idea of an enlarged space-traveling tardigrade (he was not), the enlargement of the tardigrade is the only — and, at the least, a predictable — way to render any microscopic creature a viable character in a visual work, and is not protectable. *See, e.g., Ollie v. Domino's Pizza, Inc.*, 1997 U.S. Dist. LEXIS 12781, at *11-12 (S.D.N.Y. Aug. 22, 1997) ("the humanizing of a domino is an idea not subject to copyright protection"); *Green v. Proctor & Gamble, Inc.*, 709 F. Supp. 418, 421 (S.D.N.Y. 1989) ("the idea of characterizing oral bacteria as humanoid 'cavity makers' is hardly protectible"). Similarly, the basic idea of giving the tardigrade the ability to *travel* in space is a natural and predictable extension of tardigrades' unique and well-known (and, of course, uncopyrightable) ability to *survive* unprotected in space, and is also not owned exclusively by Plaintiff. *See, e.g., Williams*, 84 F.3d at 589 (*Jurassic Park* not substantially similar to plaintiff's book series where works "share[d] a setting of a dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers" and "in

both works the characters spend the night in the dinosaur zoo and escape from dangerous dinosaurs by helicopter through the combined wit of the children and adults," because these were "classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur zoo"); *Kaye*, 297 F. Supp. 3d at 367 (Schofield, J.) (dismissing copyright claim where parties' works shared "core similarity" of "characters associated with magical gems" from space); *Dean v. Cameron*, 53 F. Supp. 3d at 648-49 ("Suspending a landmass is a predictable — if not common — way to make a vista more sweeping, breathtaking, and fantastical, and is plainly subject to both the principle that ideas are not protected and the doctrine of *scènes à faire*.").

In short, there is *no* actionable similarity based on the common use of a tardigrade in the parties' works.

### 2. None of the Other Random "Similarities" Identified by Plaintiff Are Actionable

Plaintiff's random assortment of other identified "similarities" fares no better.

<u>First</u>, Plaintiff's claim that his uniforms have been infringed by *Discovery*'s uniforms because they "delineate status rank, etc." (TAC ¶ 30) is, frankly, absurd. The Star Trek franchise has a long history of depicting uniforms that "delineate status rank, etc." and, if that were infringement, it is Plaintiff who is the infringer.[12]   In any event, it is not actionable.  *See, e.g., Williams*, 84 F.3d at 589 (no substantially similar where parties' works featured "uniformed workers" at dinosaur zoo).

<u>Second</u>, Plaintiff's claimed character similarities and common depiction of a homosexual relationship are equally unavailing.  "The bar for substantial similarity in a character is set quite high." *DiTocco*, 815 F. Supp. 2d at 667 (citation omitted).  Here, the claimed similarities amount to a "Blond White Male" who works in biology, a "darker complexion homosexual male with black hair" and facial hair, an African-American female, and a redhead.  (TAC ¶¶ 30(a-e); Ex. I at 1:46-

---

[12] *See, e.g.,* https://en.wikipedia.org/wiki/Star_Trek_uniforms.

2:42).   Such stock elements are unprotectable, and courts have routinely rejected character

infringement claims where far greater similarities existed.   *See, e.g., Hogan v. DC Comics*, 48 F.

Supp. 2d 298, 311-12 (S.D.N.Y. 1999) (no infringement where two characters had same name and

were both half-vampire and half-human, of similar age, and shared other characteristics such as

"thin-to-medium builds, pale skin, dark messy hair and a slovenly appearance"); *Lewinson v. Henry*

*Holt & Co., LLC*, 659 F. Supp. 2d 547, 567-68 (S.D.N.Y. 2009) (noting rhetorically that, "[i]f a

[stock character such as a] drunken old bum were a copyrightable character, so would be a drunken

suburban housewife, a gesticulating Frenchman, a fire-breathing dragon, a talking cat, a Prussian

officer who wears a monocle and clicks his heels, [and] a masked magician…") (citation omitted);

*Alexander v. Murdoch*, 2011 U.S. Dist. LEXIS 79543, at *31 (S.D.N.Y. May 27, 2011) (rejecting

contention that characters were "substantially similar because each is 'a stunningly beautiful, fiery,

temperamental, Latina mother, with a thick accent, who's in love with her Caucasian [ex-

husband/husband] and always makes him do the right thing, especially where her son is

concerned'"), *adopted by*, 2011 U.S. Dist. LEXIS 79503 (S.D.N.Y. July 14, 2011).[13]

---

[13] Plaintiff also attempts to mix and match character attributes to manufacture similarities. For example, he claims that *Discovery*'s homosexual astromycologist Lieutenant Stamets is "similar" to his Carter character because both are biologists (TAC ¶ 30(a)); to his Ty character because both are homosexual (*id.* ¶ 29; 2018 Treatment at 4-5 (description of Ty)); and then to his Maciek character, who is not described as homosexual in his 2018 Treatment (at 6) but has morphed into being homosexual in the TAC's collection of random similarities (TAC, Ex. B at 2), apparently because he is closer to appearance to Lieutenant Stamets.  Indeed, in his Exhibit B, Plaintiff appears to falsely characterize a picture of Macieck violently confronting Aziz as reflecting intimacy between them.  In any case, such composites do nothing to support Plaintiff's claim of character similarity.  *See, e.g., Kaye*, 297 F. Supp. 3d at 369 (mixing and matching of character attributes "is unpersuasive as the image above labeled 'Ampho' is actually Dr. Joules, who possesses no magical powers.  The more apt comparison is between Amphoman (Dr. Joules when transformed by his gem) and Steven, who bear no resemblance to each other."); *Morris v. Wilson*, 189 F. Supp. 565, 569 (S.D.N.Y. 1960) (rejecting plaintiff's claim that defendant "combined traits of two, three or more of her characters into a composite character in their play and employed 'evasive variation and coloration in order to veil the plagiarism'"), *aff'd*, 295 F.2d 36 (2d Cir. 1961).

<u>Third</u>, the other "similarities" — floating dots, ethereal travel and use of the term "emitter" (*see* Statement of Facts, Section III *supra*) — either do not exist in the actual works[14]; constitute generic unprotectable ideas[15]; and, to the extent any similarities do exist, are the very type of *de minimis*, *in*substantial and "random similarities scattered throughout the works" that "cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590 (citation and quotation marks omitted). Even limiting the analysis to the selectively plucked sequences in *Discovery* that Plaintiff identifies, the total concept and feel of these sequences is entirely *dis*similar to Plaintiff's work when considering the contextual plotlines in which these sequences occur. *See, e.g., Hayuk v. Starbucks Corp.*, 157 F. Supp. 3d 285, 292 (S.D.N.Y. 2016) ("[I]n applying the substantial similarity test, [Second Circuit courts] have found certain similarities to exist as to portions of an allegedly infringing work, but nonetheless held that substantial similarity did not exist because of overwhelming dissimilarities in the works when compared in 'total concept and overall feel'") (citation omitted); *Warner Bros., Inc. v. ABC*, 720 F.2d 231, 241 (2d Cir. 1983) (with respect to "graphic and three-dimensional works" in particular,

---

[14] As noted herein (Statement of Facts, Section III), for example, the use of headgear to enter what Plaintiff refers to as a state of "ethereal" travel has been manufactured by Plaintiff, by combining two separate and unrelated video files from his blog posts.

[15] For example, floating blue dots are commonly used in science fiction to depict strange phenomena in space. The following is just one example from the SYFY series *The Expanse* that first aired in November 2015, depicting the blue "protomolecules" at the center of the series (*see* https://screenrant.com/the-expanse-syfy-protomolecule-explained-answers/):



"dissimilarities between two works of this sort inevitably lessen the similarity that would otherwise exist between the total perceptions of the two works").  When considered in the context of the "works as a whole," as courts are instructed to do, it becomes even more clear that these "similarities" are utterly trivial when comparing the absence of *any* coherent plotline in Plaintiff's work to the richly developed and varied stories running through the approximately 11 hours of Defendants' allegedly infringing series.  *See, e.g., Green v. Harbach*, 2018 U.S. Dist. LEXIS 113608, at *18 (S.D.N.Y. July 9, 2018) ("despite whatever facial similarities Plaintiff may point to, there is little in common between how the two … scenes function in each novel's respective plot. Any similarities are either not copyrightable abstract ideas, or, when understood in context, not actually similar"), *aff'd*, 2019 U.S. App. LEXIS 3633 (2d Cir. Feb. 6, 2019).

All of Plaintiff's copyright claims fail for this fundamental reason, and should be dismissed.

## II.   PLAINTIFF'S COPYRIGHT CLAIMS AGAINST NETFLIX ARE INDEPENDENTLY BARRED BECAUSE THE COPYRIGHT ACT DOES NOT APPLY EXTRATERRITORIALLY

Plaintiff's copyright claims with respect to Netflix's international distribution of *Discovery* are barred for the additional reason that Plaintiff fails to allege any predicate acts of infringement occurring within the United States.

It is settled that "[t]he U.S. Copyright Act does not have extraterritorial application, and district courts do not have subject matter jurisdiction over infringement occurring outside of the United States." *Levitin v. Sony Music Entm't*, 101 F. Supp. 3d 376, 384-85 (S.D.N.Y. 2015).  The sole exception is when the defendant engages in a "predicate act" within the United States in furtherance of extraterritorial acts of infringement, but "[t]he clear governing legal rule is that the predicate act occurring in the United States must itself constitute *infringement* under the Copyright Act." *Id.* at 385 (citation and quotation marks omitted); *see also Roberts v. Keith*, 2009 U.S. Dist.

LEXIS 101412, at *10 (S.D.N.Y. Oct. 23, 2009) ("For the exception to apply, a plaintiff must show that the conduct (1) took place in the United States and (2) was in violation of the Copyright Act.").

Plaintiff fails to allege any such infringing predicate act in the United States by Netflix. The sole allegation concerning Netflix is that it "stream[s] the infringing work internationally" and, in the United States, that it obtained a license from CBS for such international distribution rights. (TAC ¶ 8). But the mere entry of a license agreement in the United States is not an infringing act, and thus does not constitute the required predicate act necessary to render Netflix's international distribution actionable. *See, e.g.*, *Levitin*, 101 F. Supp. 3d at 385 (rejecting argument that the mere "authorization [in the United States] of copyright infringement abroad constitutes a predicate act in violation of the Copyright Act)"); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 1996 U.S. Dist. LEXIS 18653, at *18 (S.D.N.Y. Dec. 16, 1996) ("mere authorization and approval [in the United States] of copyright infringements taking place outside the United States is not a copyright violation and does not create jurisdiction over those extraterritorial acts"). Netflix can and should be dismissed from this action for this reason alone.

## III.  PLAINTIFF'S CLAIM FOR ATTORNEYS' FEES INDEPENDENTLY FAILS BECAUSE PLAINTIFF'S COPYRIGHT REGISTRATION POSTDATES DEFENDANTS' *DISCOVERY* SERIES

Plaintiff's claim for attorneys' fees pursuant to section 505 of the Copyright Act independently fails because all of the allegedly infringing episodes of *Discovery* aired before the effective date of registration of the 2018 Treatment, the only work Plaintiff has registered.

The Copyright Act expressly provides that "no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for . . . any infringement of copyright commenced after first publication of the work and <u>before the effective date of its registration</u>, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412(2) (emphasis added). Here, the effective registration date of the 2018 Treatment is June 28,

2018 (TAC, Ex. A), more than three months after the stated first publication of Plaintiff's works in July 2017 (*id.*), and <u>after</u> *Discovery* first aired in September 2017 and concluded in February 2018. "Even '[w]here the alleged infringement begins before registration and continues after registration, statutory damages and attorney fees are still unavailable.'" *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 2016 U.S. Dist. LEXIS 101119, at *5 (S.D.N.Y. Aug. 2, 2016) (citation omitted). Accordingly, Plaintiff's claim for attorneys' fees is barred. *See, e.g., id.*; *Davis v. Gap, Inc.*, 246 F.3d 152, 158 n.1 (2d Cir. 2001).

## IV.    PLAINTIFF'S CLAIM FOR AN ACCOUNTING FAILS AS A MATTER OF LAW

Plaintiff's claim for an accounting fails for two independent reasons. <u>First</u>, the law is settled that "claims for accounting based on the defendant's alleged misappropriation and exploitation of a copyrighted work are preempted by the Copyright Act." *Baiul v. NBC Sports*, 2016 U.S. Dist. LEXIS 52291, at *33 (S.D.N.Y. Apr. 19, 2016) (dismissing accounting claim as preempted), *aff'd*, 708 F. App'x 710 (2d Cir. 2017); *see also, e.g., Weber v. Geffen Records*, 63 F. Supp. 2d 458, 462-63 (S.D.N.Y. 1999) (same). <u>Second</u>, and independently, under New York law, "[t]he right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." *Baiul*, 2016 U.S. Dist. LEXIS 52291, at *46-47 (citation omitted). Plaintiff does not and cannot allege any fiduciary relationship between him and Defendants. *Id.* (dismissing accounting claim where fiduciary relationship was not alleged).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants respectfully request that the TAC be dismissed in its entirety, with prejudice.

Dated: New York, New York
       February 12, 2019

LOEB & LOEB LLP

By: _/s/ Wook Hwang_____
    Wook Hwang
    Nathalie Russell
    345 Park Avenue
    New York, New York 10154-1895
    (212) 407-4000

*Attorneys for Defendants CBS Broadcasting Inc., CBS Corporation, CBS Interactive Inc., and Netflix, Inc.*